# In the United States Court of Federal Claims

No. 11-98C

(Filed Under Seal:  May 13, 2011)

Reissued:  May 24, 2011[1]

_____

| | |
|---|---|
| HALLMARK-PHOENIX 3, LLC,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | * Bid protest action; Challenge to agency in-<br>* sourcing decision; Motion to dismiss for lack<br>* of jurisdiction; 28 U.S.C. § 1491(b)(1);<br>* "Interested party"; Prudential standing<br>* doctrine; *Bennett v. Spear* – prudential<br>* standing doctrine applicable to bid protests;<br>* Section 1491(b)(1) does not negate doctrine;<br>* 10 U.S.C. §§ 129a and 2463(a); In-sourcing<br>* decisions subject only to legislative<br>* oversight; Contractor lacked prudential<br>* standing to challenge in-sourcing decision;<br>* Jurisdiction lacking; Dismissal granted.<br>* |

_____

## OPINION
_____

*Bryant S. Banes*, Neel, Hooper & Banes, P.C., Houston, TX, for plaintiff.

*Christopher Andrew Bowen*, United States Department of Justice, Washington, D.C., with whom was Assistant Attorney General *Tony West*, for defendant.

**ALLEGRA, Judge:**

> "[C]ourts are not charged with general guardianship against all potential mischief in the complicated tasks of government."[2]

_____

[1] An unredacted version of this opinion was issued under seal on May 13, 2011.  The parties were given an opportunity to propose redactions, but no such proposals were made.  Nonetheless, the court has incorporated some minor changes into this opinion.

[2] *Fed. Commc'ns Comm'n v. Pottsville Broad. Co.*, 309 U.S. 134, 146 (1940).

In this bid protest action, Hallmark-Phoenix 3, LLC (Hallmark or plaintiff) challenges the Air Force's decision to use its own civilian employees to supply services previously performed by Hallmark.  Plaintiff asserts that this decision was not made in accordance with two federal statutes, sections 129a and 2463(a) of Title 10 of the U.S. Code, as well as Department of Defense guidance issued thereunder.  Defendant has moved to dismiss plaintiff's complaint, claiming, pursuant to RCFC 12(b)(1), that this court lacks jurisdiction.  Having fully considered the parties' arguments, and for the reasons that follow, the court **GRANTS** defendant's motion and orders the complaint dismissed.

## I.

A brief recitation of the facts provides necessary context.[3]

Hallmark is a Houston-based company.  On July 30, 2008, the United States Air Force (the Air Force) awarded Hallmark a small-business set aside contract (FA 2521-08-C-007) to perform vehicle operations and maintenance services for the U.S. Air Force Space Command and the 45th Space Wing at Patrick Air Force Base and Cape Canaveral Air Force Station.  The contract's period of performance consists of a base year running from October 1, 2008, through September 30, 2009, and four one-year options.  The last option is scheduled to end September 30, 2013.

On October 1, 2008, plaintiff began performing the contract.  On or about November 5, 2010, a few weeks after the Air Force exercised the second option year, the Air Force's Contracting Officer (CO) sent plaintiff a letter indicating that the Air Force had decided not to exercise the remaining two option years under the contract and to direct the work under the contract to civilian personnel.  As a result, the current contract will end on September 30, 2011.

On December 20, 2010, plaintiff sent a letter to the CO objecting to the Air Force's procurement decision to in-source the scope of work under the contract.  On January 12, 2011, the Air Force reiterated its decision to Hallmark during a face-to-face meeting.  During that meeting, the Air Force allegedly acknowledged that its personnel had not strictly complied with applicable in-sourcing guidelines.  Shortly thereafter, the Air Force began listing open job positions to perform vehicle maintenance services.

On February 16, 2011, Hallmark filed a complaint in this court protesting the Air Force's in-sourcing decision.  On February 25, 2011, Hallmark amended this complaint to make clear that it was not directly contesting the Air Force's decision not to exercise the options on its current contract.  Hallmark claims that the Air Force's decision to rely upon civilian personnel rather than contractor personnel violates 10 U.S.C. §§ 129a and 2463, as well as the associated

---

[3]  These facts are drawn from plaintiff's complaint and, for purposes of this motion, are assumed to be correct.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007).

guidelines.  On March 4, 2011, defendant filed a motion to dismiss the amended complaint, asserting that this court lacks subject matter jurisdiction.  On March 29, 2011, plaintiff filed its response to the motion to dismiss.  On April 5, 2011, defendant filed its reply to plaintiff's response.  Oral argument was held on April 28, 2011.

## II.

Deciding a motion to dismiss "starts with the complaint, which must be well-pleaded in that it must state the necessary elements of the plaintiff's claim, independent of any defense that may be interposed."  *Holley v. United States*, 124 F.3d 1462, 1465 (Fed. Cir. 1997) (citations omitted); *see also Bell Atl. Corp.*, 550 U.S. at 555.  The plaintiff must establish that the court has subject matter jurisdiction over its claims.  *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988); *Hansen v. United States*, 65 Fed. Cl. 76, 94 (2005).  With respect to standing issues, this court will employ the same standard of review it employs in reviewing all motions to dismiss.  *See Warth v. Seldin*, 422 U.S. 490, 501 (1975) ("[f]or the purposes of ruling on a motion to dismiss for want of standing, both the trial and reviewing courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party"); *Metro. Wash. Airports Auth. v. Citizens for Abatement of Aircraft Noise*, 501 U.S. 252, 264 (1991) (same).

## A.

Section 1491(b)(1) of Title 28 gives this court "jurisdiction to render judgment on an action by an interested party objecting to . . . any alleged violation of statute or regulation in connection with a procurement or proposed procurement."  Defendant argues that plaintiff is not an "interested party" within the meaning of this provision and, therefore, should not be heard to complain about the Air Force's in-sourcing decision.

In *American Federation of Government Employees, AFL-CIO v. United States*, 258 F.3d 1294, 1302 (Fed. Cir. 2001), *cert. denied*, 534 U.S. 1113 (2002) (hereinafter "*AFGE*"), the Federal Circuit held that an "interested party," for purposes of section 1491(b)(1), is an "actual or prospective bidder or offeror whose direct economic interest would be affected by the award of the contract or the failure to award the contract."  *See also Distributed Solutions, Inc. v. United States*, 539 F.3d 1340, 1344 (Fed. Cir. 2008); *Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1307 (Fed. Cir. 2006).  In *AFGE*, the Federal Circuit determined that federal employees who could lose their jobs based on an agency decision to outsource work to private contractors did not qualify as "interested parties" as they were ineligible to bid on this work.  258 F.3d at 1301-02.  Unlike the employees in *AFGE*, however, plaintiff is a contractor who theoretically might have bid on any solicitation for a contract to perform the work that the Air Force instead decided to in-source.  Several cases suggest that, in such an instance, plaintiff would qualify as an "interested party" under section 1491(b)(1).  *See LABAT-Anderson, Inc. v. United States*, 65 Fed. Cl. 570, 575-76 (2005)*; see also Angelica Textile Servs., Inc. v. United States*, 95 Fed. Cl. 208, 218 (2010).  Indeed, this court recently reached this conclusion in a nearly identical case involving an Air Force decision to in-source work.  *See Santa Barbara Applied Research Inc. v.*

- 3 -

*United States*, 2011 WL 1680355, at * 6 (Fed. Cl. May 4, 2011); *see also Vero Tech. Support, Inc. v. U.S. Dept. of Def.*, 733 F. Supp. 2d 1336, 1342 (S.D. Fla. 2010).

Yet, the court cannot help but observe the pile of assumptions, reminiscent of Pelion and Ossa, that underlies plaintiff's claim that it is a "prospective bidder" within the meaning of the "interested party" definition. Unlike in *LABAT-Anderson*, there is no existing solicitation here.[4] Nor is there any assurance that there ever will be one. If this court were to set aside the Air Force's in-sourcing decision, it is conceivable, if not likely, that the Air Force would simply make a second "corrected" decision to in-source, the effect of which would be to deny plaintiff a contracting opportunity. Even if this court's rejection of the Air Force's in-sourcing decision resulted in a new procurement, there is no assurance that plaintiff could or would bid on that procurement. After all, the contract that plaintiff previously won was a small-business set aside. And there is no guarantee that the Air Force would once again reserve the requirements at issue for such a set aside, nor any statute or regulation of which the court is aware that would dictate that result. *See Totlo/King v. United States*, 87 Fed. Cl. 680, 691-92 (2009) (discussing this issue). The Air Force might instead choose to allow smaller and larger businesses to compete for a contract to provide the services in question; or it might even to bundle together similar requirements at more bases (two were originally involved here) so as to compete a much larger contract on which plaintiff is unqualified to bid. Given these circumstances, it is debatable whether plaintiff qualifies as a prospective bidder within the meaning of the Federal Circuit's definition of interested party.[5]

## B.

The court need not decide, however, whether plaintiff is an interested party for purposes of section 1491(b)(1) because it finds, in any event, that Hallmark fails to meet prudential standing requirements. These standing requirements, which proceed from an amalgam of jurisprudential assumptions and statutory interpretations, take various forms. They are different from the standing requirements dictated by Article III of the Constitution, and its case or controversy requirement, and instead "embod[y] 'judicially self-imposed limits on the exercise of federal jurisdiction.'" *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 11 (2004) (quoting *Allen v. Wright*, 468 U.S. 737, 751 (1984)); *see also Lujan v. Defenders of Wildlife*, 504

---

[4]  This point is discussed in greater detail below.

[5]  *See Fire-Trol Holdings, LLC v. United States*, 62 Fed. Cl. 440, (2004) (intention to bid on possible solicitation did not establish plaintiff as a "prospective bidder"); *Alaska Cent. Exp. Inc. v. United States*, 50 Fed. Cl. 510, 515 (2001) ("By adopting the definition [of interested party] in the CICA, the Federal Circuit implicated an established understanding of the words 'bidder' and 'offeror' that cannot be divorced from the context of the [Competition in Contracting Act's] requirement of solicitations and competitive proposals."); *G.S. Link & Assocs.*, 88-1 C.P.D. ¶ 70 (1988) (firm that cannot meet a legitimate solicitation requirement is not a prospective bidder).

U.S. 555, 560 (1992) (describing the prudential elements of standing as "judicial self-government").  They "are 'founded in concern about the proper – and properly limited – role of the courts in a democratic society.'"  *Bennett v. Spear*, 520 U.S. 154, 162 (1997) (quoting *Warth*, 422 U.S. at 498).  They aim to determine "'whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues.'"  *Allen*, 468 U.S. at 750-51 (quoting *Warth*, 422 U.S. at 498).

According to the Supreme Court, the prudential standing question is "whether the constitutional or statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief."  *Warth*, 422 U.S. at 500.  In more familiar terms, the issue boils down to "whether the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question."  *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 152-53 (1970); *see also Fed. Election Comm'n v. Akins*, 524 U.S. 11, 20 (1998); *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 39 n.19 (1976).  While this test, at least in some contexts, is "not meant to be especially demanding," *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399 (1987), the Supreme Court has made clear that standing should be denied, on prudential grounds, where plaintiffs are "merely incidental beneficiaries" of the statutory or constitutional provision at issue.  *Nat'l Credit Union Admin. v. First Nat'l Bank & Trust Co.*, 522 U.S. 479, 494 n. 7 (1998); *see also Clarke*, 479 U.S. at 399; *McKinney v. U.S. Dept. of the Treasury*, 799 F.2d 1544, 1551-52 (Fed. Cir. 1986).  Enforcement of these requirements is particularly important in "assur[ing] that the federal courts will not intrude into areas committed to the other branches of government."  *Flast v. Cohen*, 392 U.S. 83, 95 (1968).

To date, the parties have not disputed that these requirements may apply to bid protest cases filed in this court.  Plaintiff's view, in this regard, however, predates this court's recent decision in *Santa Barbara Applied Research v. United States*.  In that case, the court broke new ground in concluding that "the concept of 'prudential standing' does not apply to bid protests under section 1491(b)(1)."  2011 WL 1680355 at *7.  The opinion was swayed by the fact that "prudential standing is typically applied to challenges under the [Administrative Procedure Act (APA)]."  *Id*.  It asserted that the Federal Circuit, in *AFGE*, rejected the use of the "standing requirements imposed under the APA in favor of the 'interested party' test" in 28 U.S.C. § 1491(b)(1).  *Id*.  Based on this reasoning, the court concluded that, "[u]nder *AFGE*, once a party satisfies the more stringent 'interested party' test, standing is established."  *Id*.  But, for a host of reasons, this court must respectfully disagree.

For one thing, the Supreme Court has made quite clear that the prudential standing analysis is overarching and applies, as a general matter, both inside and outside the APA arena.  So held the Court in *Bennett v. Spear*.  There, ranch operators and irrigation districts filed an action under the citizen-suit provision of the Endangered Species Act (ESA), *see* 16 U.S.C. §

1540(g), alleging violations of the statute concerning the proposed use of reservoir water.[6]  520 U.S. at 154.  The district court, and, in turn, the Ninth Circuit dismissed the case on prudential standing grounds.  *Bennett v. Plenert*, 1993 WL 669429 (D. Or. Nov. 18, 1993), *aff'd*, 63 F.3d 915 (9th Cir. 1995).

     Reversing the Ninth Circuit, Justice Scalia, writing on behalf of a unanimous Court, first explained the broad nature of the "prudential standing" doctrine, thusly –

> In addition to the immutable requirements of Article III, "the federal judiciary has also adhered to a set of prudential principles that bear on the question of standing."  [*Valley Forge Christian College v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 470 (1982)].  Like their constitutional counterparts, these "judicially self-imposed limits on the exercise of federal jurisdiction," *Allen v. Wright*, 468 U.S. 737, 751 . . . (1984), are "founded in concern about the proper – and properly limited – role of the courts in a democratic society," *Warth*, *supra*, at 498 . . . ; but unlike their constitutional counterparts, they can be modified or abrogated by Congress, *see* 422 U.S. at 501, . . . Numbered among these prudential requirements is the doctrine . . . that a plaintiff's grievance must arguably fall within the zone of interests protected or regulated by the statutory provision or constitutional guarantee invoked in the suit . . . .  *See Allen*, *supra*, at 751 . . . *Valley Forge*, *supra*, at 474-75.

*Bennett*, 520 U.S. at 162.  While noting that *Data Processing* and its companion case, *Barlow v. Collins*, 397 U.S. 159 (1970), were both suits involving the APA, the Court was quick to point out that the doctrine was not limited to that context, observing that "later cases have applied it also in suits not involving review of federal administrative action, . . . and have specifically listed it among other prudential standing requirements of general application."  *Bennett*, 520 U.S. at 163 (citing, *inter alia*, *Dennis v. Higgins*, 498 U.S. 439, 449 (1991); *Boston Stock Exch. v. State Tax Comm'n*, 429 U.S. 318, 320-21 n.3 (1977)).  "The breadth of the zone of interests varies according to the provisions of law at issue," the Court explained, indicating that outside the "'generous review provisions' of the APA," the application of the prudential standing requirement, indeed, might allow a narrower class of claims to proceed.  *Id.* (quoting *Clarke,* 479 U.S. at 400 n.16).[7]  Nevertheless, the Court observed that "Congress legislates against the

---

    [6]  The APA was not invoked by the plaintiff owing to 5 U.S.C. § 704, which authorizes review under the APA only when "there is no other adequate remedy in a court."  *Bennett*, 520 U.S. at 161-62.

    [7]  In *Clarke*, the Supreme Court likewise suggested that the "zone of interests" test is most forgiving in the context of the "'generous review provisions'" of the APA, 479 U.S. at 400 n.16 (quoting *Data Processing*, 397 U.S. at 156).  As discussed above, the Court, nonetheless, indicated that the "zone of interests" inquiry remains relevant outside the APA context, albeit in a narrower fashion and with the possibility that other factors may be relevant in considering prudential standing.  479 U.S. at 400 n. 16; *see also* 13A Charles Alan Wright, Arthur R. Miller,

background of our prudential standing doctrine, which applies unless it is expressly negated." *Bennett*, 520 U.S. at 163.  It held that the ESA citizen-suit provision, which authorized "any person" to commence a suit, negated the zone of interests test (or in the words of the Supreme Court "more accurately expanded the zone of interest"), and on that basis – and that basis alone – overturned the Ninth Circuit's decision.  *Id.*; *see also Raines v. Byrd*, 521 U.S. 811, 820 n.3 (1997).

> *Bennett* and the other precedents cited above compel a conclusion that the prudential standing doctrine applies to this court's bid protest jurisdiction.  Certainly, the rationale for applying the doctrine – based on properly limiting the role of the courts, especially where separation of powers concerns are lurking, *see*, *e.g.*, *Warth*, 422 U.S. at 498 – snugly fits this case, in which improper judicial review threatens to interfere both with Executive Branch discretion and Legislative Branch oversight.  Section 1491(b)(1), moreover, bears none of the markings of a statute that expressly negates these prudential standing limits.  In holding that the ESA citizen-suit provision accomplished that task, the Supreme Court, in *Bennett*, contrasted the broad language of that provision with "more restrictive formulations" found in statutes that limited suits to "any person" having an "interest" adversely affected by environmental action or inaction.  *Bennett*, 520 U.S. at 164 (citing 42 U.S. § 9124(a) (Ocean Thermal Energy Conversion Act); 33 U.S.C. § 1365(g) (Clean Water Act)).  In authorizing suits by an "interested party," section 1491(b)(2) is more like the latter, "more restrictive formulations" cited by the court – in which the prudential standing doctrine remains applicable.  The *Bennett* Court was also influenced by indications that the purpose of the ESA citizen-suit provision was "to encourage enforcement by so-called 'private attorneys general,'" *Bennett*, 520 U.S. at 165, a feature conspicuously lacking here.  Accordingly, neither the language of section 1491(b)(2), nor its purpose, suggests that it should be read as negating the prudential standing doctrine.[8]

---

*et al.,* Fed. Prac. & Proc. Juris. § 3513.7 (3d ed. 2010) (hereinafter "Wright & Miller").  For the reasons that follow, this court does not believe that any of these nuances in the "zone of interests" test are determinative here.

> [8]  *See Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 535 & n.31 (1983) (Clayton Act does not abrogate prudential standing principles despite language allowing "[a]ny person who shall be injured in his business or property" to bring suit); *Phoenix of Broward, Inc. v. McDonald's Corp.*, 489 F.3d 1156, 1162-63 (11th Cir. 2007), *cert. denied*, 522 U.S. 1275 (2008) (same as to Lanham Act authorizing suit by "any person who believes that he or she is or is likely to be damaged" by conduct prohibited by the Act); *Grand Council of Crees (of Quebec) v. F.E.R.C.*, 198 F.3d 950, 955 (D.C. Cir. 2000) (statute allowing suit to be filed by "[a]ny person . . . aggrieved by an order issued by the FERC" did not negate prudential standing requirement); *Conte Bros. Auto., Inc. v. Quaker State-Slick 50, Inc.*, 165 F.3d 221, 227-28 (3d Cir. 1998) (same as to Lanham Act); *Frazer v. CAN Ins. Co.*, 374 F. Supp. 2d 1067 (N.D. Ala. 2005) (same as to Medicare Secondary Payer statute).

Indeed, it would be odd for this court to carve out an exception to the normal prudential standing principles for bid protest actions when other courts have not hesitated to apply these principles to similar cases.  Thus, when they shared jurisdiction under section 1491(b)(1),[9] the district courts held that the prudential standing doctrine applied to bid protest cases.  *See Am. Fed. of Gov't Emps., AFL-CIO v. United States*, 2001 WL 262897, at *6-7 (W.D. Tex. Mar. 7, 2001); *Am. Fed. of Gov't Emps., AFL-CIO v. Babbitt*, 143 F. Supp. 2d 927, 932-33 (S.D. Ohio 2001).  A number of other decisions have also applied the doctrine to various procurement actions, including bid protest actions brought under the *Scanwell* doctrine.[10]  Three appellate cases in this line stand out, for they hold that certain plaintiffs lacked prudential standing to challenge agency decisions to out-source requirements to private contractors.  *See Courtney v. Smith*, 297 F.3d 455, 460-61 (6th Cir. 2002), *cert. denied*, 540 U.S. 814 (2003); *Am. Fed. of Gov't Emps., Local 2119 v. Cohen*, 171 F.3d 460, 468 (7th Cir. 1999); *Nat'l Fed'n of Fed. Emps. v. Cheney*, 883 F.2d 1038, 1042 (D.C. Cir. 1989), *cert. denied*, 496 U.S. 936 (1990); *see also Am. Fed. of Gov't Emps., AFL-CIO v. United States*, 46 Fed. Cl. 586, 595 (2000) (hereinafter "*AFGE I*"), *aff'd on alternate grounds*, 285 F.3d 1294 (Fed. Cir. 2001) (same).  These cases provide strong evidence that the prudential standing doctrine ought to apply to a bid protest action like the case *sub judice*.

Nor does the Federal Circuit's opinion in *AFGE* hold otherwise.  In that case, this court, following the lead of some of the cases cited above, applied prudential standing considerations in holding that a federal employees union and two of its members could not challenge a decision to contract out the operation of three Department of Defense materiel depots.  *AFGE I*, 46 Fed. Cl. at 595-600.  It thus held that "Congress did not intend to include federal employees and their unions within the zone of interests protected" by the procurement statutes at issue.  *Id.* at 600.  Contrary to the suggestion in *Santa Barbara*, the Federal Circuit, on appeal, did not address this prudential standing issue, let alone conduct the sort of probing analysis that *Bennett* would require before the court could set aside the prudential standing requirements.  Instead, the Federal Circuit affirmed this court's dismissal on alternate jurisdictional grounds.  *AFGE*, 258

---

[9]  The Administrative Dispute Resolution Act of 1996, Pub. L. No. 104-320, § 12a, 110 Stat. 3870, 3874-75, gave this court and the district courts the bid protest jurisdiction codified in section 1491(b).  The Act, however, provided that "[t]he jurisdiction of the district courts of the United States over the actions described in § 1491(b)(1) of Title 28, United States Code . . . shall terminate on January 1, 2001."  *Id.*  Congress did not act and the sunset provision has since taken effect.

[10]  *See City of Albuquerque v. U.S. Dept. of Interior*, 379 F.3d 901, 913-14 (10th Cir. 2004) (reviewing prudential standing in case challenging Federal procurement decision); *Scheduled Airlines Traffic Offices, Inc. v. Dept. of Def.*, 87 F.3d 1356, 1359-60 (D.C. Cir. 1996) (same in case involving *Scanwell* bid protest); *Rapides Reg'l Med. Ctr. v. Sec'y, Dept. of Veterans' Affairs*, 974 F.2d 565, 570 (5th Cir. 1992), *cert. denied*, 508 U.S. 939 (1993) (same); *CC Distributors, Inc. v. United States*, 883 F.2d 146, 151 (D.C. Cir. 1989) (same); *Control Data Corp. v. Baldrige*, 655 F.2d 283, 293-94 (D.C. Cir.), *cert. denied*, 454 U.S. 881 (1981) (same).

- 8 -

F.3d at 1304.  It ruled that the scope of who is an "interested party" under section 1491(b)(1) should not be defined by reference to the standing requirement found in 5 U.S.C. § 702 ("A person suffering legal wrong because of agency action . . . is entitled to judicial review thereof.").  *AFGE*, 258 F.3d at 1302.  Finding that the parties in question were not "interested parties" under section 1491(b)(1), *id.*, the Federal Circuit had no reason to reach the question whether prudential standing considerations required the court to abstain from exercising jurisdiction.

*AFGE* thus does not hold that section 1491(b)(1) negates the prudential standing requirement that appears otherwise to apply to procurement cases.[11]  And, based on the foregoing analysis, the court specifically holds that those requirements fully apply to the bid protest action here.

## C.

For our purposes, then, the critical question becomes whether the statutes at issue can be understood as granting a contractor standing to challenge an agency's decision to fulfill its needs using its own employees.  Applying the prudential standing inquiry to this action, the court

---

[11]  With all due respect, *Santa Barbara*'s interpretation of *AFGE* turns the latter case on its head.  *AFGE* rejected the APA's standing definition because it was too expansive and clashed with  "the principle that waivers of sovereign immunity . . . are to be construed narrowly."  *AFGE*, 258 F.3d at 1301; *see also Weeks Marine*, 575 F.3d at 1359 (noting that *AFGE* adopted a "more stringent" test than that under the APA); *Baltimore Gas & Elec. Co. v. United States*, 290 F.3d 734, 738 (4th Cir. 2002) (noting that *AFGE* adopted a "more restrictive" interpretation of "interested party").  It is difficult to see how this tightening of the bid protest standing requirements somehow simultaneously relaxed those same requirements by, *sub silentio*, jettisoning prudential standing considerations generally applicable to all Federal cases.

In fact, in a later decision, *Weeks Marine*, the Federal Circuit did not hesitate to add yet another layer to the standing requirement outlined in *AFGE* to deal with a situation where there had "been neither bids/offers nor a contract award."  575 F.3d at 1361.  *Weeks Marine*, like so many other cases, illustrates the multi-faceted nature of the standing inquiry – from the jurisdictional requirements imposed by a given statute; to the constitutional requirement of injury-in-fact; to prudential limitations, like the zone of interest inquiry and the bar against raising another person's legal rights, founded on substantive statutory rights.  *See Bennett*, 520 U.S. at 162-64; *see also Allandale Neighborhood Ass'n v. Austin Transp. Study Policy*, 840 F.2d 258, 261 (5th Cir. 1988) (cataloguing six forms of prudential standing).  To be sure, individual prongs of this analysis predominate in particular decisions depending upon the facts and statutes encountered.  *See* 13A Wright & Miller, *supra*, at § 3531.7 ("The fluid character of the zone-of-interests test does not foreclose the identification of specific categories of issues that arise in application.").  But, it is important not to read a single case emphasizing one of these prongs as foreclosing the application of the other prongs in appropriate circumstances.

concludes that the injury of which plaintiff complains does not arguably fall within the zone of interests sought to be protected by these statutes.  Rather, as will be seen, all of the provisions plaintiff invokes in seeking to overturn the Defense Department's in-sourcing decision envision enforcement not by judicial review, but by legislative oversight.

Take, to begin with, section 129a of Title 10, which provides that –

The Secretary of Defense shall use the least costly form of personnel consistent with military requirements and other needs of the Department.  In developing the annual personnel authorization requests to Congress and in carrying out personnel policies, the Secretary shall –

(1) consider particularly the advantages of converting from one form of personnel (military, civilian, or private contract) to another for the performance of a specified job; and

(2) include in each manpower requirements report submitted under section 115a of this title a complete justification for converting from one form of personnel to another.

This provision was enacted in section 1483(a) of the National Defense Authorization Act for Fiscal Year 1991, Pub. L. No. 101-510, 104 Stat. 1485, 1715, the purpose of which was to provide a "[r]estatement of law relating to annual personnel strength authorizations, annual manpower requirements reports, and annual National Guard and reserve component procurement report[s]."  H. R. Conf. Rep. 101-923, at 3233 (1990).  Consistent with this purpose, all of the half a dozen or so provisions that constituted section 1483, including section 129a, refer to reports and requests made to Congress.[12]  It strains reason to suggest that Congress would bury amongst these reporting provisions a section intended to allow contractors to challenge decisions made by the Secretary on the basis of whether they constituted "the least costly form of personnel."  This suggestion becomes even more untenable once it is realized that section 129a is not a new provision, but started as a "sense of the Congress" provision first passed in 1974 and designed to have the Department of Defense factor its personnel needs into the annual authorization requests made to Congress.[13]  Plaintiff in no way may be viewed "as a proper party

_____

[12] *See* Pub. L. No. 101-510, § 1483(a), 104 Stat. at 1715 (reenacting section 115 (dealing with congressional authorization of personnel strengths); section 115a (dealing with an annual report to Congress of manpower requirements); section 115b (dealing with annual report to Congress on National Guard and reserve component equipment)).

[13] Section 129a originated as section 502 of Pub. L. No. 93-365, 88 Stat. 399, 404.  As originally passed as a note to 10 U.S.C. § 138, this provision stated –

It is the sense of Congress that the Department of Defense shall use the least costly form of manpower that is consistent with the military requirements and

to request an adjudication of a particular issue" within the domain of this budget statute.  *Sierra Club v. Morton*, 405 U.S. 727, 732 n.3 (1972) (quoting *Flast*, 392 U.S. at 100).

The same can be said of 10 U.S.C. § 2463 (2006 & Supp. 2010), as in effect at the time of the in-sourcing decision here.  Subsection (a) of that section provides:

(a) Guidelines required. – (1) The Under Secretary of Defense for Personnel and Readiness shall devise and implement guidelines and procedures to ensure that consideration is given to using, on a regular basis, Department of Defense civilian employees to perform new functions and functions that are performed by contractors and could be performed by Department of Defense civilian employees.  The Secretary of a military department may prescribe supplemental regulations, if the Secretary determines such regulations are necessary for implementing such guidelines within that military department.

(2) The guidelines and procedures required under paragraph (1) may not include any specific limitation or restriction on the number of functions or activities that may be converted to performance by Department of Defense civilian employees.

Section 2463(b)(1) states the guidelines and procedures required under subsection (a) shall provide for "special consideration to be given to using Department of Defense civilian employees to perform any function that . . . is performed by a contractor" and:

(A) has been performed by Department of Defense civilian employees at any time during the previous 10 years;

(B) is a function closely associated with the performance of an inherently governmental function;

---

other needs of the Department of Defense.  Therefore, in developing the annual manpower authorization requests to the Congress and in carrying out manpower policies, the Secretary of Defense shall, in particular, consider the advantages of converting from one form of manpower to another (military, civilian, or private contract) for the performance of a specified job.  A full justification of any conversion from one form of manpower to another shall be contained in the annual manpower requirements report to the Congress required by section 138(c)(3) of title 10, United States Code.

The legislative history of this provision described it as an integral part of the annual process for developing annual authorization requests to Congress.  *See* S. Conf. Rep. 93-1038, at 42 (1974).  In 1982, Congress dropped the phrase "[i]t is the sense of Congress" as "unnecessary," while otherwise indicating that the general purpose of the statute remained unchanged.  *See* Pub. L. No. 97-295, § 1(e), 96 Stat. 1287, 1289 (1982); H.R. Rep. No. 97-388, at 5 (1981).

(C) has been performed pursuant to a contract awarded on a non-competitive basis; or

(D) has been performed poorly, as determined by a contracting officer during the 5-year period preceding the date of such determination, because of excessive costs or inferior quality.

Section 2463(b)(2) makes similar provision for the use of civilian employees to perform "a new requirement," adding that "particular emphasis" should be given to a "new requirement that is similar to a function previously performed by Department of Defense civilian employees or is a function closely associated with the performance of an inherently governmental function." Finally, insofar as is relevant here, section 2463(c) prohibits the use of "public-private competitions" designed to promote outsourcing for a variety of functions newly assigned to Department of Defense civilian employees.

Like section 129a, the provision in which section 2463 was enacted contained a legislative reporting requirement, indicating that "[n]ot later than 180 days after the date of enactment of this Act, the Inspector General of the Department of Defense shall submit to the congressional defense committees a report on the implementation of this section and the amendments made by this section."  Pub. L. No. 110-181, § 324(b), 122 Stat. 3, 60 (originally codified at 10 U.S.C. § 2463).  When Congress amended this statute earlier this year, to include several new requirements, it likewise obliged the Secretary of Defense to "submit to the congressional defense committees a report on the decisions with respect to the conversion of functions to performance by Department of Defense civilian employees made during fiscal year 2010," and ordered the Comptroller General to submit to the same committees "an assessment of the report."  Pub. L. No. 111-383, § 323(c), 124 Stat. 4137, 4184 (2011).  Notably, this same statute further stated that "[n]othing in this section shall be construed . . . to require the Secretary of Defense to conduct a cost comparison before making a decision to convert any acquisition function or other critical function to performance by Department of Defense civilian employees, where factors other than cost serve as a basis for the Secretary's decision."  *Id.* at § 323(d).

In spite of this language, plaintiff would have this court enforce the guidelines issued by the Secretary of Defense under these provisions, ignoring the limited budgetary context in which those guidelines arise.  While those guidelines are specific in mapping out procedures for comparing private versus public costs, nothing in them remotely suggests an intent to confer a right to judicial review – nor does it seem that the agency, in deciding what sort of  guidance to issue, could expand the scope of interests covered by the statute so as to afford prudential standing to someone who did not have standing under the statute itself.[14]  There is little to

---

[14]   *See Town of Stratford v. Fed. Aviation Admin.*, 285 F.3d 84, 89 (D.C. Cir. 2002) ("We do not see how any agency regulation implementing a statute could extend prudential standing beyond the class of person Congress intends . . . ."); *Beckham County Rural Water Dist. No. 3. v. City of Elk City*, 2007 WL 710208, at *9 (W.D. Okla. Mar. 6, 2007); *see also Clarke*, 479 U.S. at

distinguish these internal Department of Defense guidelines from the sorts of FAR guidelines and other internal agency guidance that courts have regularly refused to enforce.  *See Carolina Tobacco Co. v. United States*, 402 F.3d 1345, 1349 (Fed. Cir. 2005); *Am. Tel. & Tel. Co. v. United States*, 307 F.3d 1374, 1380 (Fed. Cir. 2002), *cert. denied*, 540 U.S. 937 (2003); *ConocoPhillips v. United States*, 73 Fed. Cl. 46, 52-53 (2006).  Two cases decided by the General Accountability Office, indeed, have recognized as much in flatly dismissing protests of in-sourcing decisions based upon alleged violations of section  2463(a) (and section 129a).  *See Triad Logistics Serv. Corp.*, 2010 C.P.D. ¶ 279 (2010) ("since the cited guidance issued pursuant to section 2463 was only internal DoD policy, the assertion that the agency did not adhere to that policy guidance is not a basis for challenging the agency's action"); *Aleut Facilities Support Servs.*, 2009 C.P.D. ¶ 202 (same).  The court agrees with these decisions.[15]

Nor is there any nontextual indication that, in enacting section 2463, Congress intended to prompt anything other than the creation of internal agency procedures subject to legislative oversight.  The critical portions of section 2463 were first enacted by section 343 of the National Defense Authorization Act for Fiscal Year 2006, Pub. L. No. 109-163, 119 Stat. 3136, 3200-3201 (codified at 10 U.S.C. § 2461 note (2006)).  The version of the bill passed by the House of Representatives would have required the Secretary of Defense to conduct a formal public-private competition before deciding to in-source a requirement, akin to the formal process for out-sourcing authorized in Office of Management and Budget (OMB) Circular A-76, as modified, 68 Fed. Reg. 32134.  *See* H.R. 1815, 109th Cong. (2005); H.R. Rep. No.109-89, at 305 (2005).  Ultimately, however, Congress rejected this approach in favor of a simpler requirement that the Secretary "prescribe guidelines and procedures to ensure that consideration is given to using federal government employees for work that would otherwise be performed under Department of

---

399 ("The essential inquiry is whether Congress intended for a particular class of plaintiffs to be relied upon to challenge agency disregard of the law.").

[15]  In *Santa Barbara*, the court noted that the 2011 amendments to section 2463 "prevent[ed] DoD from imposing any specific quotas or goals on in sourcing without a considered cost analysis and mandated that the DoD conduct a specific cost comparison that takes into account the 'full costs of civilian and military manpower' before making any in-sourcing decision, where, as here, cost alone is the deciding criteria."  2011 WL 1680355, at *8 (quoting Pub. L. No. 111-383, §323(a), 124 Stat. at 4184).  The provision cited by the court, however is inapplicable in this case, as the in-sourcing decision here was made prior to the January 7, 2011, effective date of this statute (incidentally, this appears to have been true in *Santa Barbara*, as well).  While the amended statute makes specific reference to the existing Defense Department guidelines, that feature does not, in this court's view, make in-sourcing decisions  under the amended statute reviewable.  This is because the amendment does not fundamentally change the nature of section 2463 as focusing on legislative oversight, rather than judicial review, as the means of enforcement.  Indeed, as mentioned above, the same Congress that passed the requirements highlighted in *Santa Barbara* also imposed new reporting and review requirements to bolster its legislative oversight of this issue.

- 13 -

Defense contracts, but could be performed by federal government employees." H.R. Conf. Rep.109-360 at 672 (2005).  The accompanying Conference Committee Report indicated that the conferees expected "these guidelines to provide for the assignment of work to federal government employees (and for hiring new federal government employees) in appropriate circumstances, without the requirement to perform public-private competition under Office of Management and Budget Circular A-76 or any other provision of law or regulation." *Id.*  It is reasonable to assume that in not requiring agencies to conduct formal competitions, like those associated with out-sourcing determinations made under OMB Circular A-76, Congress intended to avoid the protest litigation occasioned by such competitions.[16]  This legislative history, as well

---

[16]  A few more words on this point are in order.  Section 2461 of Title 10 of the U.S. Code expressly references the most recent version of Circular A-76 (as revised May 2003) and directs that agencies perform outsourcing activities in accordance with that circular.  Unlike either section 2463 or section 129a, section 2461 mandates that outsourcing decisions be "based on the results of a public-private competition" that includes "the issuance of a solicitation" in response to which private firms and government-in-house staff submit "offers" which are then "formally compare[d]" by the agency.  *See* 10 U.S.C. § 2461(a); *see also* OMB Circular A-76, ¶ 4; OMB Memorandum M-08-11 (Feb. 20, 2008).  It was the existence of these features – familiar vocabulary in bid protest cases – that led this court to conclude that contractors may protest an agency's decision not to outsource a particular requirement.  *See LABAT-Anderson*, 65 Fed. Cl. at 574-75; *Space Mark, Inc. v. United States*, 45 Fed. Cl. 267, 272-73 (1999); *see also Nat'l Treasury Emps. Union v. Internal Revenue Serv.*, 2006 WL 416161 (D.D.C. Feb. 22, 2006).  And it is the absence of those same formalities – which we now know is no accident – that serves to distinguish the less formal process required here from that which was held to give rise to standing in these other cases.  (Indeed, until Circular A-76 was modified to include these formalities, courts held that decisions made under the circular were not reviewable either.  *See, e.g., Local 2855, AFGE (AFL-CIO) v. United States*, 602 F.2d 574 (3d Cir. 1979)).  Accordingly, it appears that the court in *Santa Barbara*, 2011 WL 1680355, at *7, was simply wrong in asserting that a protest under the sections at issue "presents an analogous challenge" to those made under Circular A-76.

These same textual distinctions and legislative history also serve to distinguish this case from the primary case upon which plaintiff relies, *CC Distributors v. United States*, 883 F.2d 146 (D.C. Cir. 1989)*.*  In that case, the D.C. Circuit examined section 1223 of the National Defense Authorization Act for Fiscal Year 1987, § 1223, 100 Stat. 3816, 3977 (1986) (codified at 10 U.S.C. § 2304 note (1986)), which mandated that the Secretary of Defense procure certain supplies and services from a source in the private sector.  *CC Distributors*, 883 F.3d at 152.  In concluding that the interest of an outside contractor was within the zone of interests to be protected by this section, the D.C. Circuit relied heavily on legislative history indicating that Congress intended that the statute would compel competitions between private firms and government sources.  *Id.* at 152-53 (quoting S. Rep. No. 331, at 278 (1986)).  The court also found that the contractor's interests were aligned with Congress' goal in passing the statute, which was to promote efficiency through outsourcing.  Neither of these points is true here and, for that reason, the court finds *CC Distributors* inapposite.

- 14 -

as that underlying section 324 of the National Defense Authorization Act for Fiscal Year 2008, Pub. L. No. 110-181, 122 Stat. 3, 60, in which section 2463 was reenacted, suggests that Congress' reason for doing so was to encourage the Defense Department to make greater and more flexible use of civilian employees.  *See* H.R. Conf. Rep. 110-477, at 878 (2007) (noting that the purpose of the bill is to "ensur[e] full consideration is given to using federal employees").

**D.**

Based on the foregoing, this court concludes that neither section 129a nor section 2463 confers prudential standing upon plaintiff to challenge the in-sourcing decision here.  This conclusion is reinforced by the Federal Circuit's decision in *American Telephone and Telegraph Co. v. United States*, *supra* (hereinafter "*AT&T*").  In that case, the Federal Circuit upheld a decision by this court dismissing a suit by AT&T in which the company sought damages based on the Navy's alleged violation of section 8118 of the Department of Defense Act.  307 F.3d at 1377.  The latter statute provided limits on certain fixed-price contracts and required the Undersecretary of Defense to make periodic reports to the Congressional appropriations committees regarding the obligation of such contracts.  *Id.*[17]  The Federal Circuit rejected the notion that this section afforded this court the ability to invalidate a contract that did not comply with the spending provisions.  *Id.* at 1379.  In this regard, the court wrote:

> The language of section 8118 does not explicitly create a cause of action for enforcement of its expenditure prohibitions.  Instead the only explicit provision with enforcement consequences in section 8118 requires quarterly reports to the "Committees on Appropriations of the Senate and the House of Representatives in writing."  Thus, section 8118 envisions enforcement, if any, through legislative

---

[17]  Section 8118 provided that:

None of the funds provided for the Department of Defense in this Act may be obligated or expended for fixed price-type contracts in excess of $10,000,000 for the development of a major system or subsystem unless the Under Secretary of Defense for Acquisition determines, in writing, that program risk has been reduced to the extent that realistic pricing can occur, and that the contract type permits an equitable and sensible allocation of program risk between the contracting parties:  Provided, That the Under Secretary may not delegate this authority to any persons who hold a position in the Office of the Secretary of Defense below the level of Assistant Under Secretary of Defense: Provided further, That the Under Secretary report to the Committees on Appropriations of the Senate and House of Representatives in writing, on a quarterly basis, the contracts which have obligated funds under such a fixed price-type developmental contract.

Pub. L. No. 100-202, § 8118, 101 Stat. 1329, 1329-84 (1987).

procedures.  The language permits the appropriate legislative committees to monitor compliance and, presumably, guarantee enforcement in the form of future reductions in, or limitations on, appropriated funds. . . .  Based on that oversight, the committees and Congress can then adjust the spending allotments in future bills to ensure compliance with legislative objectives.  Thus section 8118 is an appropriations oversight provision that envisions enforcement, if any, in the form of legislative spending adjustments in future bills.  Section 8118 does not make any provision for judicial enforcement.

*Id.* at 1377-78.[18]  The court concluded that "[i]n sum, the language of section 8118 provides for legislative oversight and enforcement" and "does not create a cause of action inviting private parties to enforce the provision in courts."  *Id.* at 1379.

Now, plaintiff is quick to point out – and correctly so – that *AT&T* is not a prudential standing case.  Yet, the conclusions reached by the Federal Circuit in that case and the striking similarities between the statute it considered and those confronted by the court cannot help but impact the interpretational task at hand.  Like the statute in *AT&T*, the statutes at issue contain reporting requirements that signal Congress' desire to enforce the in-sourcing requirements in these statutes through oversight.  *See id.* at 1377 ("[P]laintiffs cannot claim a protectable interest in the proper application of Section 8118 for Congress intended to give them none.").  Where statutes are drafted in this fashion, it is not this court's "role to discipline the agency's compliance with the supervisory and report instructions of congressional oversight."  *Am. Tel. & Tel. Co. v. United States*, 177 F.3d 1368, 1375 (Fed. Cir. 1999) (en banc).[19]  As was true in *AT&T*, plaintiff here is, at best, an indirect beneficiary of the statutes in question and not among those Congress relied upon to challenge alleged agency disregard of the law.  *See Cort v. Ash*, 422 U.S. 66, 78 (1975).  Rather, Congress chose to rely on itself to perform the latter task.  Accordingly, in the court's view, *AT&T* lends considerable weight to the conclusion that the

_____

[18]  The court further observed that "appropriation bills often contain this kind of oversight provision that permits the appropriation committees to properly monitor federal spending programs," citing, as examples of this phenomenon, various Defense Appropriation Acts.  *AT&T*, 307 F.3d at 1377-78.  The same, of course, is true of authorization statutes of the sort encountered in this case.

[19]  *See Longshore v. United States*, 77 F.3d 440, 443 (Fed. Cir.), *cert. denied*, 519 U.S. 808 (1996) ("Congress has undoubted capacity to oversee the performance of Executive Branch agencies, consistent with its constitutional authority.  It is not for this court to instruct Congress on how to oversee and manage its creations."); *E. Walters & Co. v. United States*, 576 F.2d 362, 367 (Ct. Cl. 1978) ("The fact that a procurement practice is prohibited does not necessarily mean that it is therefore actionable.  The discipline to be administered in such cases is a responsibility of the cognizant procurement officials within the agency [and not] by this court."); *see also Union Pac. Ins. Co. v. United States*, 464 F.3d 1325, 1332-33 (Fed. Cir. 2006) (same).

statutes in question do not envision judicial enforcement of the in-sourcing requirements. *See also ConocoPhillips*, 73 Fed. Cl. at 52; *Gould, Inc. v. United States,* 66 Fed. Cl. 253, 259 (2005).

It is not enough that plaintiff will experience a competitive injury as a result of the in-sourcing decision or that this injury might be remedied by a ruling setting aside that decision. For even where it is undisputed that a governmental decision causes competitive injury, a plaintiff must demonstrate that its interests are protected by the statutes in question. *See Data Processing*, 397 U.S. at 154; *see also Leaf Tobacco Exporters Ass'n, Inc. v. Black*, 749 F.2d 1106, 1112 (4th Cir. 1984) ("In *Data Processing*, undisputed competitive injury did not relieve the plaintiffs from demonstrating that their interests were protected by the statute in question."). Nor does plaintiff's standing turn upon the unavailability of other parties to challenge the in-sourcing decision. As the Supreme Court has stated, "the assumption that if respondent have no standing to sue, no one would have standing, is not a reason to find standing." *Valley Forge Christian College*, 454 U.S. at 489 (quoting *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 227 (1974)). Rather, "our system of government leaves many crucial decisions to the political process." *Schlesinger*, 418 U.S. at 227. Nor does the mere existence of an alleged statutory violation confer standing. "[A]n asserted right to have the Government act in accordance with law is not sufficient, standing alone, to confer jurisdiction on a federal court." *Allen*, 468 U.S. at 754; *see also Whitemore v. Arkansas*, 495 U.S. 149, 160 (1990) (citing numerous cases).

What is controlling here – and what demands, in the final analysis, that plaintiff's case be dismissed – is the language of the statutes in question. That language indicates that Congress intended to reserve for itself, and not any court, the twin job of deciding whether the Defense Department has properly in-sourced various tasks and of requiring the agency to changes its policies as proved necessary. Both tasks were to be accomplished by application of the considerable pressures of the legislative process – what Madison, in Federalist No. 48, referred to as Congress' "complicated and indirect measures." *See United States v. Richardson*, 418 U.S. 166, 179 (1974) ("In a very real sense, the absence of any particular individual or class to litigate these claims gives support to the argument that the subject matter is committed to the surveillance of Congress, and ultimately to the political process."). To infer otherwise risks triggering a wave of cases brought by hopeful contractors each believing that they have the likely prospect of receiving a contract if a particular function is outsourced. The disruption inherent in such cases likely would hinder the ability of the Department of Defense to establish, on a timely basis, its personnel needs in formulating its authorization requests to Congress, thereby impeding the legislative oversight process that Congress intended to establish.[20]

---

[20]   Protests like this one lack the normative and temporal framework associated with the typical protests encountered by this court. Unlike the latter cases, actions like this have no inherent time limitations. Under plaintiff's theory, a single in-sourcing decision could produce one or even a dozen protests, strung out over months or perhaps even years. The timing of those protests would not be cabined by the award schedule associated with a particular solicitation because the statutory process does not envision having such a solicitation or, for that matter, any sort of public/private competition. There is no assurance, as well, that protests would be brought

- 17 -

Would the same Congress that sought to promote in-sourcing expose those decisions to protests filed by outside contractors?  It is hard to imagine this.[21]  To be sure, to establish prudential standing "there need be no indication of congressional purpose to benefit the would-be plaintiff."  *Clarke*, 479 U.S. at 399-400; *see also Nat'l Credit Union Admin.*, 522 U.S. at 492.  At the same time, however, the Supreme Court has emphasized that the prudential standing doctrine "seeks to exclude those plaintiffs whose suits are more likely to frustrate than to further statutory objectives," denying a right to review "if the plaintiff's interests are so . . . inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit."  *Clarke*, 479 U.S. at 399; *see also Thompson v. N. Am. Stainless, LP*, 131 S. Ct. 863, 870 (2011); *Corrosion Proof Fittings v. Envtl. Protection Agency*, 947 F.2d 1201, 1209 (5th Cir. 1991); *CC Distributors*, 883 F.2d at 152.[22]  The statutes in question are not silent

_____

quickly because there is no mechanism in these statutes for alerting potential protestors to the in-sourcing decisions.  (Here, of course, plaintiff found out about the in-sourcing decision through an informal contact with agency personnel).  Presumably, the only things that would limit the timing of such suits are the six-year statute of limitations found in 28 U.S.C. § 2501 (assuming it is not somehow tolled) and, perhaps, the potential for the assertion of laches.  A series of protests involving the same in-sourcing decision could substantially undermine the ability of an agency to make budget and personnel decisions – the same decisions that Congress intended to review under the statute.  It would also leave civilian employees hired under such in-sourcing decisions in limbo, at risk of being terminated or transferred if the decision were ultimately overturned.  The prudential standing test, of course, is designed to prevent courts from creating such dilemmas, as it "affords a . . . means of excluding litigation that casts an overpowering aura of officious intermeddling."  13 Wright & Miller, *supra*, at § 3531; *see also* Peter Raven-Hansen, "Making Agencies Follow Orders:  Judicial review of Agency Violations of Executive Order 12,291," 1983 Duke L.J. 285 (1983).

[21]   Plaintiff argues that Congress intended to subject cost comparisons to judicial review, but not in-sourcing decisions made based upon non-cost considerations.  This distinction is not only somewhat implausible.  It puts the cart before the horse.  The question presented is whether the statutes in question confer standing.  If the answer is that they do not – which appears to be the case – the court and the parties should never reach the merits of a particular decision, particularly where the determination of the nature of that decision requires the development of a record.  Plaintiff's claim also ignores the fact that prudential standing is determined on a wholesale basis, with the court called upon to determine whether categories of claimants were intended to be conferred rights under a particular statute.

[22]   Indeed, this principle of prudential standing was relied upon by at least three circuits in denying government employees the right to challenge out-sourcing decisions under statutes that were designed to promote that practice.  *See Courtney*, 297 F.3d at 461; *Am. Fed. of Gov't Emps., Local 2119*, 171 F.3d at 471; *Nat'l Fed'n of Fed. Emps.*, 883 F.2d at 1042-54.  Subsequent to these decisions, as well as the Federal Circuit's decision in *AFGE*, Congress passed a specific provision authorizing certain federal employees to challenge the outcome of

- 18 -

in this regard.  Rather, the text, structure and legislative history of these provisions all reveal that these statutes were not designed to confer benefits on outside contractors.  And it is that negative intent, rather than the absence of an affirmative intent to confer standing on outside contractors, that ultimately dictates the conclusion that plaintiff here lacks the prudential standing to challenge the Air Force's in-sourcing decision.

**E.**

A final note is warranted.  Reflection on the issues involved suggests that the prudential standing analysis here is interrelated with the prejudice inquiry that the Federal Circuit has instructed this court to perform as another aspect of establishing whether a protester has standing.  Both inquiries confront, in scope and implication, the same basic question – is the plaintiff a suitable challenger of the agency's decision?  Both inquiries involve a preliminary look at the merits – or at least the statutes and regulations from which those merits spring.  The Federal Circuit thus has repeatedly held that a protestor must show, on a preliminary basis, that it was prejudiced by a significant error in the procurement process.  *Labbatt Food Serv. Inc. v. United States*, 577 F.3d 1375, 1378 (Fed. Cir. 2009).  The Federal Circuit has instructed, in this regard, that "[i]t is basic that because the question of prejudice goes directly to the question of standing, the prejudice issue must be reached before addressing the merits." *Info Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003); *accord Labatt*, 577 F.3d at 1378-79; *Myers Investigative & Sec. Servs. v. United States*, 275 F.3d 1366, 1369-70 (Fed. Cir. 2002) ("[S]tanding is a threshold jurisdictional issue. . . .  [P]rejudice (or injury) is a necessary element of standing."); *see also Weeks Marine*, 575 at 1361.  Cases construing this standing requirement have held that it requires a "viable allegation of agency wrongdoing." *McKing Consulting Corp. v. United States*, 78 Fed. Cl. 715, 721 (2007); *see also 210 Earll, L.L.C. v. United States*, 77 Fed. Cl. 710, 719 (2006); *Textron, Inc. v. United States*, 74 Fed. Cl. 277, 284–85 (2006).

In *Galen Medical Associates, Inc. v. United States*, 369 F.3d 1324 (Fed. Cir. 2004), the Federal Circuit, in further describing the prejudice requirement, stated that "'it may be that even a proven violation of some procurement regulation . . . will not necessarily make a good claim,'" adding that "'[n]ot every regulation is established for the benefit of bidders as a class, and still fewer may create enforceable rights . . .'" *Id.* at 1330 (quoting *Keco Indus., Inc. v. United States*, 492 F.2d 1200, 1206 (Ct. Cl. 1974)).  Though not framed in prudential standing terms, the latter point is a corollary of the "zone of interest" formula and, indeed, harkens back to language in many prudential standing cases. *See, e.g.*, *Clarke*, 479 U.S. at 399 ("The essential inquiry is whether Congress 'intended for [a particular] class [of plaintiffs] to be relied upon to challenge agency disregard of the law.'" (insertions in original) (quoting *Block v. Community Nutrition Inst.*, 467 U.S. 340, 347 (1984)).)  Indeed, in *Burroughs Corp. v. United States*, 617 F.2d 590,

---

public-private competitions conducted under Circular A-76.  *See* Pub. L. No. 108-375, § 326(a)(2), 118 Stat. 1811, 1848 (codified at 31 U.S.C. § 3551(2)(B)).  There is no comparable provision authorizing the suit by plaintiff here.

599 (Ct. Cl. 1980), the same prejudice rationale compelled the Court of Claims to reject a
challenge to a procurement decision predicated upon alleged violations of a provision that was
found not to confer enforceable rights on a contractor.  In so concluding, the Court of Claims
reasoned:  "[a]n examination of the legislative history behind the price requirement in negotiated
procurement[s] reveals the purpose of the requirement is to save the Government money, not to
give offerors enforceable rights vis-à-vis other offerors."  *Id*. at 599.  In the court's view, this
prejudice analysis, though not the same as the prudential standing analysis, reinforces the
conclusion that plaintiff lacks standing to invoke statutes that plainly were not intended to benefit
outside contractors, but rather were intended to promote Congress' goal of using civil employees
to perform more tasks.

That the application of these standing requirements leaves plaintiff with no remedy may
seem unfair to some.  But, it is important to note that the actions taken by the Air Force here are
of a sort that traditionally have not been subject to bid protest review.  That has been the case,
for example, with agency decisions not to execute an option.  *See Jones Automation, Inc. v.
United States,* 92 Fed. Cl. 368, 371 (2010); *Gov't Tech. Servs. LLC v. United States*, 90 Fed. Cl.
522, 527-28 (2009).[23]  This court has likewise refused to review, under its bid protest
jurisdiction, an agency's determination of its own needs.  *See Che Consulting, Inc. v. United
States*, 74 Fed. Cl. 742, 747 (2006) ("An agency's determination of the 'best method of
accommodating' its needs . . . falls within the agency's discretion." (quoting *United Enter. &
Assocs. v. United States*, 70 Fed. Cl. 1, 26 (2006))); *see also NEQ, LLC v. United States*, 88 Fed.
Cl. 38, 49 (2009); *Wit Assocs., Inc. v. United States*, 62 Fed. Cl. 657, 662 (2004); *see generally*,
*Control Data Corp.*, 655 F.2d at 293.  Although it vigorously contends otherwise, plaintiff, in
effect, would have this court conduct precisely the sort of review that these other cases preclude
– predicated solely upon the view that had the Air Force perceived its needs differently, it would
have either extended plaintiff's existing contract or offered plaintiff a new contracting
opportunity.  In the court's view, internal agency decisions of the sort at issue do not suddenly
become reviewable because they are predicated on an in-sourcing decision.  A contrary ruling
would fling open the doors of this court to any contractor who can reasonably claim that an
agency's in-sourcing decision denied it a contracting opportunity.[24]  Such putative plaintiffs
constitute neither a small nor well-defined class.  Congress plainly did not intend this.

[23]   For similar rulings involving efforts to enjoin the termination of a contract, *see Data
Monitor Sys., Inc. v. United State*s, 74 Fed. Cl. 66, 71-72 (2006) (holding that the court lacked
jurisdiction under the bid protest provisions of section 1491 to enjoin a contracting agency's
termination of a contract); *Griffy's Landscape Maint. LLC v. United States,* 51 Fed. Cl. 667, 672-
73 (2001) (holding that the awardee of a contract may not challenge the decision to terminate
that contract by invoking the court's bid protest jurisdiction).

[24]   One looking for evidence of the potential for such suits need only look at the series of
such cases filed just within the last eighteen months.  *See*, *e.g.*, *K-Mar Indus. v. U.S. Dep't of
Def.*, No. 5:10-cv-984 (W.D. Okla. Nov. 4, 2010); *Rothe Dev., Inc. v. U.S. Dep't of Def.*, No.
SA-10-CV-743-XR, 2010 WL 4595824 (W.D. Tex. Nov. 3, 2010); *Harris Enters. & Speed
Aviation v. U.S. Dep't of Def.*, No. 5:10-cv-573 (W.D. Tex. Oct. 12, 2010); *Vero*, 733 F. Supp.2d

- 20 -

**III**.

Based on the foregoing, the court concludes that plaintiff lacks standing to challenge the Air Force's in-sourcing decision under 10 U.S.C. §§ 129a and 2463(a).  The court does not come to this decision lightly, fully recognizing the potential impact on plaintiff.  Here, however, this result is compelled by the statutes in question – indeed, to rule otherwise almost certainly would be to act in derogation of Congress' intent.  Accordingly, the court **GRANTS** defendant's motion to dismiss.   The Clerk is hereby ordered to dismiss the complaint.[25]

**IT IS SO ORDERED**.

s/ Francis M. Allegra
Francis M. Allegra
Judge

at 1366; *see also* Complaint *K-Mar Indus., Inc. v. U.S. Dep't of Def.*, No. 10-CV-00456-HRO-JMR (S.D. Miss. Sept. 17, 2010); Complaint *Unified Consultants Grp, Inc. v. U.S. Dep't of Def.*, No. 5:10-CV-00135-TBR (W.D. Ky. July 9, 2010); Complaint, *Rohmann Servs., Inc. v. U.S. Dep't of Def.*, No. 10-CV-00061-XR (W.D. Tex. Jan. 26, 2010); Complaint, *Mori Assocs., Inc. v. United States*, No. 10-298 (Fed. Cl. May 17, 2010).   More cases could be listed, but the point should already be clear.  While some of the district courts in these cases have (correctly) concluded that they lack jurisdiction, it appears more accurate to say that no court has jurisdiction over suits such as these.

[25]  The court intends to unseal and publish this opinion after May 23, 2011.  On or before May 20, 2011, each party shall file proposed redactions to this opinion, with specific reasons therefor.